**TRENK, DiPASQUALE, WEBSTER,
DELLA FERA & SODONO, P.C.**
347 Mt. Pleasant Avenue, Suite 300
West Orange, New Jersey 07052
(973) 243-8600
Richard D. Trenk (RT 6874)
Thomas M. Walsh (TW 0645)
Adam D. Wolper (AW 6169)
Counsel for Debtor

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CARTERET ARMS, L.L.C., | ) Case No. 09-31726 |
| | ) |
| Debtor. | ) Honorable Morris Stern |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| CARTERET ARMS MANAGEMENT, L.L.C., | ) Case No. 09-31728 |
| | ) |
| | ) Honorable Morris Stern |
| Debtor. | ) |
| | ) Hearing Date: October 30, 2009 at 11:00 a.m. |
| | ) |

**OPPOSITION OF DEBTOR CARTERET ARMS, LLC TO NEW YORK COMMUNITY BANK'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND/OR TO DISMISS DEBTOR'S CASE OR, IN THE ALTERNATIVE, FOR ADEQUATE PROTECTION**

TO:   THE HONORABLE MORRIS STERN
      UNITED STATES BANKRUPTCY JUDGE

Carteret Arms, L.L.C. ("Debtor" or "CAL"), by its counsel, Trenk, DiPasquale, Webster, Della Fera & Sodono, P.C., hereby opposes the motion of New York Community Bank ("NYCB") for an order (1) granting NYCB relief from the automatic stay; and/or (2) dismissing Debtors' chapter 11 case, or, in the alternative, for adequate protection (the "Motion"), and respectfully states:

**PRELIMINARY STATEMENT**

Quite simply, NYCB has completely failed to show the necessary "cause" for dismissal of the Debtor's bankruptcy case, nor has it shown the lack of an equity cushion necessary for it to obtain relief from the automatic stay.  In its Motion, NYCB alleges as follows: (a) that the Debtor's decision to file bankruptcy was a "bad faith" filing and "cause" exists for dismissal of the Debtor's bankruptcy case, because there is diminution of the estate and no likelihood of rehabilitation; and (b) that NYCB is entitled to stay relief due to the lack of an equity cushion in the Debtor's property.  As the Debtor demonstrates below, NYCB has such little support for those specious arguments that it resorts to artifices and unsubstantiated statements to try to make its case.  Most important, NYCB relies on evidence that is not properly part of the record before this Court.

First, the Debtor shows below that there is no diminution of the Debtor's estate, since the Debtor has been cash flow positive since the beginning of the case, and is current on all of its post-petition obligations.  Additionally, the Debtor has provided a detailed and meticulously prepared set of projections that show its ability to reorganize and rehabilitate its operations.

Second, the Debtor shows that its decision to file its petition for relief under chapter 11 of the Bankruptcy Code was certainly not made in "bad faith."  Contrary to the allegations of NYCB, the Debtor has a viable, operating business, with significant rental income and a committed management team.  The Debtor filed its petition to preserve and maximize the value of that business as a going concern, which is one of the quintessential purposes of chapter 11 bankruptcy.

Third and finally, the Debtor will show that NYCB's interests in the Apartments (as defined below) are "adequately protected" pursuant to the Bankruptcy Code.

In support of those arguments, the Debtor relies on the relevant sections of the Bankruptcy Code, the case law interpreting those provisions, and the Certifications of the two (2) executives of its managing agent Connolly Properties ("CPI"): the Certification of Valle Schloesser ("Schloesser Certif."), and the Certification of Melvin Scheinerman ("Scheinerman Certif."). In sum, there are no grounds to grant any of the relief requested by NYCB in the Motion. Accordingly, the Motion should be denied in its entirety.

## STATEMENT OF FACTS

CAL is a limited liability company of the State of New Jersey. Carteret Arms Management, LLC ("CAM") is the sole member of CAL. David Connolly is the sole manager of both CAL and CAM. CAM is wholly-owned by the Carteret Arms Trust, of which Connolly is the trustee, as well as one of a number of beneficiaries.

CAL and CAM are both affiliates of Connolly Properties, Inc. ("Connolly Properties"), a property management company located in Plainfield, New Jersey. For years, Connolly Properties, through its principals David and Donna Connolly, has provided high quality, affordable rental housing to residents of East Orange, Plainfield, Trenton, and Camden, New Jersey, as well as Allentown, Pennsylvania.

CAL's sole business consists of owning and operating the Carteret Arms Apartments (the "Property"), a 276-unit apartment (the "Apartments") building located at 333 West State Street in Trenton, New Jersey. The Property has an occupancy rate of approximately eighty-seven (87%) percent. CAL purchased the property in 2007 for approximately $17,500,000.

CAL collected revenue of $2,062,908 in the year 2008, and through July 31, 2009, has collected revenue of $1,444,624 in the year 2009.

3

CAL and CAM do not have employees; rather, all of their workers are employed by Connolly Properties, the management company for the Property.

**Secured Debt**

On October 30, 2007, CAL obtained a $13,000,000 loan from New York Community Bank ("NYCB"), which was evidenced by a promissory note (the "NYCB Note") that CAL issued to NYCB on that same date.  See Motion, Exh. A.  The NYCB Note provides for an initial[1] interest rate of six (6%) percent per annum, and is for a term of ten (10) years.

To secure the loan from NYCB, Cal granted NYCB a first mortgage in the Property, as well as an assignment of leases and rents (collectively, the "NYCB Mortgage").  Id.

At the same time, CAL also obtained a mezzanine loan from Urban American Capital, L.L.C. ("UAC") in the amount of $1,200,000, which was evidenced by a promissory note (the "UAC Note") that CAL issued to UAC on October 30, 2007.  The UAC Note provides for an interest rate of eleven (11%) percent per annum, and is for a term of five (5) years.  The terms of the loan from UAC were further memorialized in a loan agreement between CAL, UAC, CAM, and Connolly (the "UAC Loan Agreement").  CAM and Connolly both executed the UAC Loan Agreement as "limited indemnitors."

In addition to the limited indemnities that UAC received from CAM and Connolly, UAC's loan to CAL was and is secured as follows:

     a.    CAM executed a *Membership Pledge and Security Agreement and Collateral Assignment* in favor of UAC, in which it pledged its membership interest in CAL as security for the loan; and

---

[1] Pursuant to the NYCB Note, the interest rate is to remain at 6% percent until the "first change date," which is on November 1, 2012. Upon that time, the interest rate will become the "Prime Rate" plus 2.5 basis points (but with a mandatory minimum of 6%, and a mandatory maximum of 16%).

4

      b.      Pursuant to a security agreement dated October 30, 2007 – CAL granted UAC security interests in, *inter alia*, its rents, leases, insurance claims and proceeds thereof, personal property, fixtures, and future payment rights.

In connection with their respective loans, NYCB and UAC (collectively, the "Lenders") entered into an *Intercreditor Agreement* in which they agreed, *inter alia*, as follows:

      a.      UAC acknowledged that its interests in CAL's property, collateral, rights, titles, and interests were subordinate to those of NYCB in those same items;

      b.      UAC acknowledged that its rights to receive payment from CAL in connection with its loan (and supporting documents) were subordinate to those of NYCB;

      c.      That in the event of a bankruptcy filing by CAL, UAC could not receive any payment or distribution from CAL until all of CAL's indebtedness to NYCB was paid in full;

      d.      That in the event of a bankruptcy filing by CAL, payments from CAL to NYCB would be paid in the following order: (i) first, to the part of CAL's indebtedness to NYCB that did not represent principal and interest; (ii) next, to the interest on the loan; and (iii) finally, to the principal on the loan; and

      e.      That in the event of a bankruptcy filing by CAL, regardless of the value of NYCB's collateral, UAC would be subordinated to all obligations of CAL to NYCB, including interest accrued both pre- and post-petition.

CAL failed to make its payments under the NYCB Note on April 1, 2009.

5

## LEGAL ARGUMENT

### POINT I

### NYCB'S MOTION IS UNSUPPORTED, AND THEREFORE, IT MUST BE DENIED IN ITS ENTIRETY

"Briefs, as well as statements drafted by attorneys, are not evidence." Koch Materials Co. v. Shore Slurry Seal, Inc., 205 F. Supp.2d 324, 328 n.1 (D.N.J. 2002), reconsideration denied, 209 F. Supp.2d 418 (D.N.J. 2002). See also De Aguilar v. Boeing Co., 11 F.3d 55, 57 (5th Cir. 1993) ("Clearly, the affidavit of a lawyer without personal knowledge of the extent of each of the plaintiffs' claims sheds little, if any, light on the actual amount in controversy."); Wyler v. United States, 725 F.2d 156, 160 (2d Cir. 1983) (finding that attorney's affidavit unsupported by specific facts or personal knowledge was not entitled to any weight); In re Med-Atlantic Petroleum Corp., 233 B.R. 644, 662 (Bankr. S.D.N.Y. 1999) ("Assertions in the motion signed by counsel, without factual support and not based upon counsel's personal knowledge of the facts, have no probative value."). "Thus, exhibits attached to briefs or statements are also not evidence." Koch, 89 F. Supp.2d at 328 n.1.

In this case, all of NYCB's allegations are based upon the mere information and belief of its counsel. See Motion. In addition, certain allegations are totally unsupported. For example, NYCB asserts "the value of the Property has significantly declined and there exists no equity cushion," Motion at 5, and that "NYCB's position continues to erode as the Debtor has no ability to service this debt on a current basis." Id. Such allegations have no probative value. Moreover, the exhibits on which NYCB relies, including, but not limited to, the appraisal and the certification regarding the calculation of amounts due and owing, are attached to the Motion. Thus, these exhibits likewise lack probative value. Finally, NYCB has failed to comply with

6

Local Rule 4001-1(c) (requiring a certification with exhibits). NYCB's Motion must be denied for these reasons alone.

## POINT II

### NYCB IS NOT ENTITLED TO RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)(1)&(d)(2)

Section 362(d)(1) provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . such as by terminating, annulling, modifying, or conditioning such stay for cause, including the lack of adequate protection of an interest in property of such party in interest."  11 U.S.C. § 362(d)(1).

"[I]n determining whether a secured creditor's interest is adequately protected, most courts engage in an analysis of the property's 'equity cushion' - the value of the property after deducting the claim of the creditor seeking relief from the automatic stay and all senior claims." Nantucket Invs. v. California Fed. Bank (In re Indian Palms Assocs., Ltd.), 61 F.3d 197, 207 (3d Cir. 1995).

"Many courts have focused on the presence or absence of an equity cushion in determining whether a secured creditor has adequate protection of his collateral." In re Cardell, 88 B.R. 627, 632 (Bankr. D.N.J. 1988). "When a movant alleges that the stay should be lifted because no equity cushion exists, and the parties stipulate that there is no equity cushion, the creditor has established his prima facie case." In re Morysville Body Works, Inc., 86 B.R. 51, 56 (Bankr. E.D. Pa. 1988) (quoting In re Ludwig Honold Mfg. Co., 33 B.R. 722, 723 (Bankr. E.D. Pa. 1983)).  See also In re 200 Woodbury Realty Trust, 99 B.R. 184, 185 (Bankr. D.N.H. 1989) (finding that "there is no 'equity cushion' in the property which might serve to provide adequate protection to [the moving party] and justify any delay in lifting the automatic stay for cause under § 362(d)(1)"); Perin v. N-Ren Corp. (In re N-Ren Corp.), 65 B.R. 661, 663 (Bankr. S.D.

7

Ohio 1986) (granting relief from the automatic stay where mortgagee had no equity cushion); In re Goulin Realty, Inc., 60 B.R. 283 (Bankr. D.R.I. 1986) (finding moving party entitled to foreclose mortgage on property "because of the absence of an equity cushion").

In the present case, it would appear that the Debtor owes approximately $13 million in unpaid principal to NYCB under the Notes. Motion, Exh. D. Meanwhile, it is NYCB's burden to prove any issues relating to equity in the Property. 11 U.S.C. § 362(g). In addressing the value of the Property, however, NYCB manages to allege, through an appraisal that has no probative value, only that "the current value of the property is between $13,200,000 and $13,600,000." Motion at 5. In fact, in October 2007, the Debtor purchased the Property for $17,500,000. As a result, the Debtor maintains that, if it succeeds in reorganizing, it will be able to market the Property for a profitable use. Hence, NYCB's encumbrances do not exceed the value of the Property. It follows that an ample equity cushion exists. Further, because an ample equity cushion exists, a temporary failure to pay debt service cannot possibly erode NYCB's position. Moreover, because NYCB is the senior secured lender, the status of the subordinate debt, Motion, Exh. D, is irrelevant for the purposes of this analysis. Accordingly, NYCB is not entitled to relief from the automatic stay under section 362(d)(1)&(d)(2).[2]

Finally, it must be noted that NYCB's "calculation" of its claim at $14,395,754.17 is overstated. See Motion, Exh. D. NYCB's claim includes two hundred twenty-two (222) days at the default rate (16%) of interest, notably a (10%) increase from the initial contract rate (6%) of interest. Clearly, NYCB is attempting to enforce a penalty on the Debtor. "The determination of whether [a] contract to increase interest after a default is a penalty, is one of state law and state policy." Matter of Timberline Property Development, Inc., 136 B.R. 382, 385 (Bankr. D.N.J.

---

[2] It is important to note that NYCB is not entitled to relief under 11 U.S.C. § 362(d)(2) for the reasons outlined in Points III-IV of the opposition.

1992).  Under New Jersey law, while default interest rates are presumed reasonable, they are subject to the reasonableness test.  Metlife Capital Financial Corp. v. Washington Ave. Associates L.P., 159 N.J. 484, 501 (1999).  Default interest rates must be reasonable estimates of potential damages.  Id. (stating that a three percent (3%) default interest increase was a "reasonable estimate of the potential costs of administering a defaulted loan, and the potential difference between the contract interest rate and the rate that MetLife might pay to secure a commercial loan replacing the lost funds").  Although lenders cannot be certain as to the precise actual damages which will be occasioned by a breach, the reasonableness test is applied to determine the permissible range of default interest.  Id. at 501-503 (citations omitted).

In addition, "[a] default provision providing for an unreasonable increase in the contract interest rate is unenforceable as a penalty."  Id. at 501 (citations omitted).  Courts "have invalidated enhanced default rates if their size suggests a punitive intent."  Id.  For instance, the Bankruptcy Court for the District of New Jersey has held that, under both New Jersey and federal law, an increasing interest rate after default was an unenforceable penalty where it was designed to coerce prompt payment.  Timberline Property Development, 136 B.R. at 386.  Critically, the court stated that such clauses "must be designed to provide actual compensation to a creditor for administrative or other costs incurred as a result of the default."  Id. at 385.  As such, NYCB's claim for default interest in the amount of $1,282,667.16 (222 day period) severely overstates its claim by approximately $801,000.

## POINT III

### NYCB HAS NOT ESTABLISHED "CAUSE" FOR
### DISMISSAL OF THE DEBTOR'S BANKRUPTCY CASE

"Conversion or dismissal of a Chapter 11 case is a drastic measure and the burden is on the movant to prove the relief requested is warranted and not premature."  In re Dark Horse

9

Tavern, 189 B.R. 576, 580 (Bankr. N.D.N.Y. 1995).  Section 1112 of the Bankruptcy Code governs the issue of conversion of chapter 11 cases to chapter 7 cases.  Pursuant to 11 U.S.C. § 1112(b)(1):

> Except as provided in paragraph (2) of this subsection . . . and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested . . . dismissal . . . is not in the best interests of creditors and the estate, the court shall . . . dismiss a case under this chapter . . . **if the movant establishes cause**.

11 U.S.C. § 1112(b)(1) (emphasis added).  However,

> "Paragraph (b)(2) provides generally that dismissal or conversion under subsection (b)[1] shall not be granted if there is a reasonable likelihood that a plan will be confirmed within a certain time period and the grounds for dismissal or conversion include an act or omission for which there is a reasonable justification and which will timely be cured."

Resnick, A. & Sommer, H., BANKRUPTCY CODE, COLLIER PAMPHLET EDITION at 986 (LexisNexis, 2009); 11 U.S.C. § 1112(b)(2).

Pursuant to 11 U.S.C. § 1112(b)(1), the burden of proof is on the movants to establish "cause" for dismissal.  Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.), 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007).  The Bankruptcy Code contains a list of sixteen (16) non-exclusive factors in connection with whether the movant has established "cause" under subsection (b)(1).  11 U.S.C. § 1112(b)(4).  In the instant case, the only one of those sixteen factors cited by NYCB is 11 U.S.C. § 1112(b)(4)(A) ("substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation").

In deciding whether "cause" exists to dismiss a chapter 11 case based upon "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," the court must conduct a two-part inquiry:  (i) first, it must examine the debtor's

track record to determine whether it is suffering losses or making gains, <u>and</u> (ii) it must then decide whether rehabilitation is likely given the evidence presented at the hearing. <u>Gateway</u>, 374 B.R. at 562; <u>see</u> also <u>In re The 1031 Tax Group, L.L.C.</u>, 374 B.R. 78, 93 (Bankr. S.D.N.Y. 2007) ("The fact that there is a continuing loss to the estate, due to the mounting administrative costs and the lack of any new business entering the estate, is **insufficient** to establish 'cause' within the meaning of § 1112(b).") (emphasis added). Rather, the movant must show continuing loss to the estate *and* the absence of a reasonable likelihood of rehabilitation. <u>Id.</u> (holding that despite continuing monetary loss to estate from debtor's operations, "cause" did <u>not</u> exist because debtor worked closely with Committee to formulate plan and disclosure statement, and because plan was viable).

In the instant case, NYCB has not shown that there is a substantial or continuing loss to, or diminution of, the estate:

    A.    First, since the Petition Date, the Debtor has increased its occupancy rates, and reduced its number of delinquent tenants. <u>See</u> Scheinerman Certif.

    B.    Second, the Debtor's estate is not operating at a loss. As evidenced by the Debtor's monthly operating reports for August and September 2009, the Debtor has generated a positive net income since the Petition Date.

    C.    Moreover, the Debtor's greater-than-expected free cash flow (as shown in the Debtor's monthly operating reports) will enable the Debtor to make larger adequate protection payments to NYCB going forward.

Nor has NYCB even come close to showing that the Debtor does not have a reasonable likelihood of rehabilitation. As evidenced by the Debtor's twelve-month projections (annexed to the Schloesser Certif at Exhibit **"A"**), the Debtor has shown that with a modest restructuring of

11

its debt to NYCB, the Debtor is profitable and able to pay its debt service obligations. Accordingly, NYCB has no basis for its assertion that the Debtor does not have the ability to reorganize.

Finally, as meticulously outlined by Melvin Scheinerman, CPI's Chief Operating Officer, in his Certification that is included herewith, the Debtor has recently made large strides in its leasing, marketing, maintenance, and collection efforts. That zealous focus on accountability and efficiency shows that the Debtor is serious about its reorganization and rehabilitation from an operational as well as a financial standpoint, and it further shows that the Debtor is willing to undertake the complex yet necessary efforts to restructure its operations.

### POINT IV

### THE DEBTOR CLEARLY DID NOT FILE ITS PETITION IN BAD FAITH; THEREFORE, THE DEBTOR'S BANKRUPTCY CASE SHOULD NOT BE DISMISSED

In addition to, or possibly as a supplement to, the "cause" factors set forth in 11 U.S.C. § 1112(b), chapter 11 bankruptcy petitions are subject to dismissal under section 1112(b) unless filed in "good faith." In re SGL Carbon Corp., 200 F.3d 154, 159-62 (3d Cir. 1999). This judge-made doctrine should be used "only sparingly and with great caution." In re General Growth Properties, Inc., 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009).

In determining whether a debtor has filed a reorganization plan in good faith, the United States Court of Appeals for the Third Circuit has mandated that courts focus on the following two factors: (1) whether the petition serves a valid bankruptcy purpose, *e.g.*, by preserving a going concern or maximizing the value of the debtor's estate; and (2) whether the petition is filed merely to obtain a tactical litigation advantage. In re Integrated Telecom Express, Inc., 384 F.3d 108, 119-120 (3d Cir. 2004) (citing SGL Carbon, 200 F.3d at 165). "Whether the good faith requirement has been satisfied is a 'fact intensive' inquiry in which the court must examine the

12

'totality of the facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" Integrated Telecom, 384 F.3d at 118 (citing SGL Carbon, 200 F.3d at 162).

First, the Debtor's petition serves a valid bankruptcy purpose because its impetus is to preserve the Debtor as a going concern. Prior to the Petition Date, the Debtor was struggling to pay its debts to NYCB and its trade creditors due to the fact that the number of delinquent tenants in the Apartments had spiked dramatically, causing the Debtor's rental income to drop. Like thousands of other businesses in similar situations, the Debtor filed its petition to obtain a breathing spell while it attempted, and still attempt, to work through those issues.

The Debtor still has current monthly revenues of approximately $160,000; it still houses hundreds of tenants in the Apartments; and it still employs, via its management company, a number of superintendents, property managers, and maintenance persons. Thus, it is both shocking and absurd for NYCB to argue that the Debtor has no business to preserve, and no income to use to further that preservation. The value of the Apartments will be maximized to a much greater extent by reorganizing the Debtor's viable and ongoing business in chapter 11, as opposed to a sheriff's sale after a state-court foreclosure. Though NYCB may disagree with the Debtor's decision to file, that does not mean that the Debtor did not file for a valid bankruptcy purpose.

Moreover, the Debtor's petition would still serve a valid bankruptcy purpose even if the Debtor did not intend to reorganize. The Third Circuit has recognized that liquidations under chapter 11 preserve value as well. See, e.g., Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.), 324 F.3d 197, 211 (3d Cir. 2003) (holding that reorganization is not the only "appropriate use of Chapter 11 since the Code clearly recognizes liquidating plans under 11

13

U.S.C. § 1123(b)(4), whereby a debtor may develop a Chapter 11 plan to sell off all of its assets."). Therefore, it is clear that if the Debtor wanted to sell all or some of the Apartments by way of its chapter 11 case, that is also a valid bankruptcy purpose and an express negation of any purported "bad faith" on the Debtor's behalf.

Second, the fact that the Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code shortly after NYCB commenced a state-court foreclosure action was not an attempt to gain a "tactical litigation advantage." Rather, it was the Debtor's last and only option in furtherance of its goal of preserving its business and property. Courts throughout the county have repeatedly recognized that a chapter 11 petition filed after a debtor has been named a defendant in a foreclosure action is not grounds for deeming the Debtor's decision to file for bankruptcy to be in "bad faith." See, e.g., In re Route 202 Corp., 37 B.R. 367, 373 (Bankr. E.D. Pa. 1984) (filing a bankruptcy petition on the eve of a scheduled foreclosure sale is not, by itself, sufficient to constitute bad faith); Little Creek Development Co. v. Commonwealth Mortgage Corp. (In re Little Creek Development Co.), 779 F.2d 1068, 1073-74 (5th Cir. 1986) (holding that statements of debtor's counsel that petition was filed in order to escape necessity of posting bond in ongoing state court proceeding did not provide sufficient evidence to establish lack of good faith in filing petition).

As such, it is clear that because the Debtor had and still has a viable business to preserve, there is no "bad faith" whatsoever in the Debtor's decision to file its petition for relief under chapter 11 of the Bankruptcy Code.

Finally, it should also be noted that NYCB's allegations that this case fits the mold of a typical "bad faith filing" are preposterous. Contrary to NYCB's assertions, there are multiple

unsecured creditors, some with large claims; the Debtor clearly has an operating business; and the Apartment is not a vacant piece of land.

## CONCLUSION

Based upon the foregoing, the Debtor respectfully requests that the Court deny the Motion in its entirety.

                                      Respectfully submitted,

                                      TRENK, DiPASQUALE, WEBSTER,
                                       DELLA FER & SODONO, P.C.
                                      Counsel for Debtor

                                    By:   /s/ Richard D. Trenk
                                            Richard D. Trenk

Dated: October 28, 2009